MANUEL ROSE *vs.* SOCONY-VACUUM CORPORATION.

FEBRUARY 10, 1942.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker & Condon, JJ.

CONDON, J. This is an action of trespass on the case for nuisance. It is based on the alleged negligence of the defendant in allowing a large quantity of gasoline to escape into the ground on its premises· whence plaintiff alleged that it percolated through the earth on the ground waters to his premises and polluted his water supply, caused the deaths of a large number of his hogs and substantially depreciated the value of his real estate. A justice of the superior court before whom the case was tried without a jury found the defendant guilty of negligence; but he also found that the plaintiff had failed to prove, by a fair preponderance of the evidence, that any of the escaped gasoline had invaded his premises. The trial justice accordingly decided for the defendant and plaintiff excepted to such decision. The case is here on this single exception.

The plaintiff contended in this court that the trial justice had overlooked, disregarded, or misconceived the probative evidence on the vital issues in the case, and, further, that his decision was manifestly against the great weight of such evidence and was, therefore, clearly wrong. Defendant contended, in reply, that the trial justice had properly and carefully weighed the conflicting evidence and that his decision should not be disturbed because a

review of the evidence would show that it did substantial justice between the parties.

Before proceeding to consider these contentions, it may be helpful to summarize briefly the undisputed facts out of which the present controversy arose. The plaintiff and defendant were the proprietors in January 1929 of neighboring parcels of land on the Wampanoag Trail, a state highway in the town of East Providence. Plaintiff's parcel was situated approximately north of the highway and was used by him for a farm on which he raised garden truck and also hogs and fowl for market.

Near the southeast corner of the farm and close to the highway were plaintiff's dwelling, outbuildings, a gasoline station, and a well which was situated to the south of the house and not far from the gasoline station. Generally north and west of the house, beginning at a point about 200 feet from the highway, there was on plaintiff's premises a small shallow stream which flowed north and slightly east. It had been dammed to form a shallow pool very close to the northern boundary of the premises. There was a piggery in this section of the farm about 800 feet north and slightly west of the house, and there was a fenced runway leading from the piggery to the pool where plaintiff allowed his hogs to wallow.

Plaintiff's premises were bounded on the east by land of the defendant and also by other land known as the Mancib farm. In the northeasterly section of that farm was a spring frequently referred to in the evidence as the Mancib spring.

South of the highway and opposite plaintiff's farm defendant owned another parcel of land, on which were located a number of tanks in which it stored large quantities of gasoline. Each of these tanks bore a number. Tank No. 39 was situated about 800 feet southeast of plaintiff's house and well. Near this tank and slightly to the southeast of it was a "sump", which defendant used for storing water that it pumped from Runnins River, a small tidal stream.

Although not wholly salt, this water had an exceedingly high salt content. Northwest of this sump and tank No. 39, and slightly south of the highway, was a well known as the Langlois well. Northeast of tank No. 39 and also slightly south of the highway was another well called the Martin well. This well was about 450 feet southeast of plaintiff's well, and the Langlois well was several hundred feet southwest of it.

In January 1929 a break occurred in a connecting pipeline of tank No. 39, through which about 815,728 gallons of gasoline escaped into the ground near the tank before the break was discovered. The point of the break was about 800 feet from plaintiff's well, 1800 feet from his stream, and about 1800 feet from the Mancib spring. Immediately upon discovery of the break defendant tried to recover from the ground as much of the gasoline as it could. It caused about a dozen or more holes to be dug to trap the gasoline in the ground water. A series of holes were dug by defendant's servants at several places on defendant's premises, where it was thought the gasoline might be found.

By following this method, over 70,000 gallons of gasoline were trapped and recovered by pumping for about a month or more after the break. During this time and for a year afterward the water in the sump near tank No. 39 was closely watched for evidence of gasoline, but none was ever seen or found there. Not until over a year later did defendant discover any more of the gasoline. Then, on or about July 19, 1930, gasoline was discovered in the Martin well. Thereafter, until March 19, 1931, when pumping ceased there, 23,500 gallons of gasoline were recovered from this well. In July or August 1930 gasoline was also discovered for the first time in the Mancib spring. Varying quantities, very much mixed with water, amounting in all to about 50,000 gallons were recovered from this source from time to time until September 1939, when no more was found. No gasoline was ever found in the Langlois well and its salt count was found to be normal at the time the Martin well

and the Mancib spring were very abnormal in this respect.

Sometime in April, May, or June, 1930, plaintiff was not sure which month, he noticed a bad taste in the water from his well and sent a test sample to the office of the health department at the state house. Later he received a report from that department and thereafter he and his family did not use the water for drinking purposes. The plaintiff testified that he noticed a "taste of gas" in the water but he did not introduce in evidence the report from the health department. In July 1930, either about the time defendant started to pump gasoline from the Martin well or after gasoline was found in the Mancib spring, plaintiff first complained to defendant that its gasoline had invaded his farm and polluted both his well and his stream. After some investigation by its agents, defendant denied that there was any gasoline in plaintiff's water supply or that its gasoline had escaped into plaintiff's premises. The plaintiff thereupon brought the instant action, alleging the invasion of the gasoline, the death of his hogs from drinking gasoline in the water of the stream and the depreciation of his farm because of such pollution of its water supply.

The theory of the plaintiff's case was that the defendant had negligently allowed its gasoline to escape and penetrate the ground and that, by reason of such negligence, it had created a nuisance in the ground water that percolated to his premises. See *Rose* v. *Socony-Vacuum Corp.*, 56 R. I. 272. Since the trial justice has found defendant guilty of the negligence alleged and defendant has brought no exception here, we are not concerned with that issue. The only question before us is whether the trial justice erred in finding that the plaintiff had failed to prove the invasion of his premises by gasoline from defendant's pipeline and the death of his hogs by drinking gasoline emanating from the same source.

The plaintiff tried his case in the superior court on the theory that the ground water carried defendant's gasoline

to his premises, where it appeared in his well and also' in his stream, which constituted the sole water supply of his farm. To prove that such invasion was possible, plaintiff called as an expert witness Professor Charles W. Brown, head of the department of geology at Brown University. To prove that there was gasoline in the well and also in the stream in the spring and summer of 1930, and in later years, he presented his three sons and some other witnesses and also testified himself. He also presented the testimony of expert witnesses who testified to the composition of the water as disclosed by chemical and bacterial examinations. To prove that his hogs died from drinking gasoline, he called as experts several veterinarians who testified that gasoline was poisonous and could cause death; and did cause the deaths of plaintiff's hogs.

The defendant agreed that its gasoline escaped on the ground water but denied that any of it invaded plaintiff's premises or that there was any gasoline in plaintiff's water supply or that his hogs were fatally poisoned by gasoline. Defendant claimed that the ground water on its premises near the point of the break in its pipeline followed a definite downward ground water slope in a northerly direction to a valley and then trended northeast on its premises, corresponding also with the surface slope of this valley, to the Martin well and beyond to the Mancib spring. Defendant also claimed that the slope of this valley was away from and not toward plaintiff's well and stream.

In support of this claim, the defendant produced, as an expert witness, Professor Alonzo W. Quinn, also of the department of geology at Brown, who testified at great length on questions concerning the geology of the section comprising the area in question, the movement of the ground water through such area and the direction of the ground water slope. Much of his testimony was clearly in conflict with that of Professor Brown, or went further, tending to show that Professor Brown, in some vital particu-

lars, had unwarrantably assumed certain conditions on which to base his conclusions.

On the question whether gasoline was present in plaintiff's well and stream as claimed by him, defendant also called experts and others who testified contrary to the plaintiff's witnesses. As to the deaths of the hogs, defendant produced expert witnesses who denied that gasoline was a fatal poison if ingested by hogs. Each of these witnesses testified that, in his opinion, the plaintiff's hogs died of hog cholera, and not from gasoline poisoning. In addition to the testimony in the case, maps and plans were introduced by both sides as exhibits. There was a question as to the correctness of some of the exhibits that had been presented by the plaintiff. In one instance, plaintiff's own witness, Professor Brown, questioned the correctness of one of the plaintiff's exhibits.

Upon consideration of the trial justice's rescript in the light of our examination of the transcript, we are of the opinion that he did not overlook, disregard, or misconceive any of the probative evidence. His rescript shows that he has fairly and correctly analyzed such evidence in determining whether or not the plaintiff had proved each of the essential elements of his case by a fair preponderance of the evidence. It was necessary for the trial justice to make a finding on each of these elements, and he did so. It is not necessary for us to do the same, if we are of the opinion that he was not clearly wrong in finding that the plaintiff had failed to prove the invasion of his premises by defendant's gasoline.

We shall, therefore, take up this issue first. The plaintiff had the inescapable burden of proving that defendant's gasoline could and did invade his premises as alleged. His whole claim is fundamentally based on this proposition. To discharge this burden on causal connection he relied almost wholly on Professor Brown's testimony. Testimony of other witnesses of a gasoline odor from the water or of its oily appearance, indicating or suggesting the likeli-

hood of gasoline being present, would not necessarily prove that *defendant's* gasoline had actually gotten into plaintiff's well and stream. It is significant that none of plaintiff's witnesses testified that he had actually found gasoline in the water of either the well or the stream. Such testimony amounted to no more than that the witness saw oily patches or an iridescent film on the water, or detected an odor therein such as the odor of gasoline, or that the water tasted "like gas".

Plaintiff terms such testimony positive evidence of the presence of gasoline in the water and terms the testimony for the defendant to the contrary merely negative evidence. He then seeks to obtain the benefit of the well-recognized rule that positive evidence is of greater probative force than negative evidence. The testimony here is not of the positive and negative character claimed by the plaintiff and therefore does not call for the application of that rule. For a proper application of the rule, see our opinion recently filed in *Enterprise Garnetting Co.* v. *Forcier,* C. T., 67 R. I. 336, 23A. 2d 761.

It was testified by defendant's bacteriologist, and conceded by plaintiff's chemist as well as by his bacteriologist, that the most satisfactory analysis of water is a bacteriological analysis supplementing a chemical one. Apparently adopting this view plaintiff produced two chemists and a bacteriologist as expert witnesses. Each of these witnesses had analyzed samples of the water taken from the well and stream on various dates, and testified as to the results of their examinations. Each of these chemists personally obtained his samples on plaintiff's premises. The bacteriologist obtained his samples from one of the chemists, who had taken them from the well and stream when he took his chemical samples.

Each of these chemists testified that in some, though not in all, of his samples he noticed an oily film or detected an odor like that of gasoline. In the case of some of the samples each testified that there was a suggestion or

trace of gasoline. However, the bacteriologist's reports
of his examinations, which were introduced in evidence as
exhibits for the plaintiff, did not note any indication or
suggestion of gasoline in his samples. And he testified, on
cross-examination, that in making his analyses he did not
see any evidence of gasoline on, or detect any odor thereof
in, such samples. He further testified that if he had
done so he would certainly have noted such facts in his
reports.

In reply to plaintiff's evidence on these issues, defendant
produced a number of witnesses who testified that they
were on plaintiff's premises on various days in July and
August 1930 and on later occasions and that they detected
no odor of gasoline, either at the stream or at the well.
They also testified that they saw oily patches on the stream
but that they examined them further and noted that they
were not formed by petroleum. These witnesses identified
such patches as due to iron bacteria.

One of these witnesses was a chemist and he testified that
the water in the pig wallow, which was made by damming
the stream, was scummed with iron and had a swampy
odor. He also testified that the ground around the wallow
was discolored in some places with iron. And he testified
further that, when one looks at a film of iron on water,
such as this scum, it is practically impossible to tell it
from a petroleum or gasoline film until it is examined.
Usually this can be done by merely disturbing the scum
or patch, as the reaction of a petroleum film to such dis-
turbance is different from that of an iron film. He went
on to testify that an analysis would disclose such difference
with certainty and that he analyzed samples of this scum
and definitely found it to be iron. This same witness
further testified that he had taken samples of the water in
plaintiff's well and stream at various times in 1930 and
succeeding years and had chemically analyzed them; and
that there was no gasoline in any of them nor was there

any indication or suggestion of it to the eye or the nose in making the analyses.

The defendant's bacteriologist testified that the "oily patches" or scum on plaintiff's stream were common in stagnant waters and sluggish shallow streams and that such patches, on superficial examination, so closely resembled oil that they had come to be referred to as "fool's oil". He also testified that he had personally taken several samples of the well water at various times, and at such times there was no evidence of any oil or gasoline on such water, or any odor of gasoline in the well. He further testified positively and definitely that there was no gasoline in the samples which he analyzed but that he found the water in the well to be polluted with B. coli and unfit for drinking purposes; and also that such pollution appeared to him to come from the unsanitary condition of the surface of the ground to the north and west of the well.

This testimony of defendant's chemist and bacteriologist as to the nature and cause of the oily patches or scum on the stream was not contradicted. Nor did plaintiff undertake to explain why his bacteriologist found no evidence of gasoline in the samples of water which had been procured by one of plaintiff's chemists from the well and the stream at the same time such chemist had procured his own samples, in some of which he claimed to have noted a suggestion or indication of gasoline. This is especially important in view of the uncontradicted testimony of the defendant's bacteriologist that no one would be better situated to find evidence of gasoline in the water than the bacteriologist in making his analyses.

If all of the evidence on this issue is carefully analyzed, it will be clear that the trial justice was not required to treat the defendant's evidence as lacking in probative force but that he could weigh it in the same manner as plaintiff's evidence. He could not fairly and reasonably have treated defendant's evidence as not inconsistent with or not contradictory to plaintiff's evidence merely because defendant's

witnesses did not examine the water at the same time as plaintiff and his witnesses. In view of the plaintiff's theory as to how defendant's gasoline invaded his premises, a difference of days or weeks in making the respective examinations of water taken from the same well or stream would be of no consequence, unless plaintiff showed by his evidence that the ground water conditions were actually different on the occasions of such examinations. The testimony of Professor Brown that the movement of the gasoline would be more or less pulsatory or intermittent is not of itself sufficient to prove the existence of such different conditions at the time the respective examinations of the water were actually made.

The real question is whether the decision of the trial justice is contrary to the great weight of the probative evidence and therefore clearly wrong. The plaintiff complains that the trial justice did not properly weigh the evidence. He also complains that the trial justice did not accord to his positive evidence of facts the greater probative force to which he claims it was entitled over defendant's theoretical evidence. This claim apparently relates more particularly to the evidence which concerned the presence of gasoline in the well and stream which we have considered above and therefore need not again discuss. However, he strongly urges that the probative evidence in his favor, "on both the issue of invasion of the farm, well and stream by defendant's gasoline and the cause of the death of the pigs", is overwhelming.

Without repeating what we have said concerning the evidence on the question of the presence of gasoline in the well and stream, we are of the opinion that the trial justice could reasonably have found that the plaintiff had failed to prove by a fair preponderance of the evidence that there was gasoline in his well and stream. We are also of the opinion that his findings on the issue of the invasion of plaintiff's premises by gasoline from defendant's

premises and on the issue of the cause of the deaths of plaintiff's hogs are reasonably warranted by the evidence.

As to the invasion by defendant's gasoline, there was nothing in the character or content of the expert testimony for the plaintiff that would justify us in finding that the trial justice was clearly wrong in not adopting the conclusions of Professor Brown. The trial justice saw both Professor Quinn and Professor Brown as they testified and of course thereby had a better opportunity to weigh their testimony than we have from a mere reading of the transcript. This advantage was of substantial benefit to him, as was also the view which he took of the premises before the trial, in resolving the conflict of expert opinions on the geological conformation of the area in question, the height of the ground water table and the direction of the ground water slope.

Professor Brown testified that, in his opinion, the ground water slope from the point of break in the pipeline on defendant's premises was northwest toward the Wampanoag Trail and into the plaintiff's farm. Professor Quinn, on the other hand, testified that such ground water slope was generally north trending northeast on defendant's premises and continuing in the latter direction across the Trail to the Mancib Farm and beyond to the Mancib Spring. He also testified that he confirmed this opinion by sinking four test holes on defendant's premises, south of the Trail opposite plaintiff's premises and a little south and east of plaintiff's house and well, and three on defendant's premises north of the Trail, bounding easterly on plaintiff's premises.

Only one of these holes showed any gasoline and that was test hole No. 7 which was northeast of the break in defendant's pipeline. The first four holes showed ground water elevations lower than the "surficial" contour elevations to the north across the Trail near plaintiff's house and well, showing, the witness claimed, that the ground water slope was away from and not toward the house and

well. These ground water elevations also showed that the ground water slope was to the Martin well and beyond the Trail to test hole No. 7 and to the Mancib spring 1800 feet away from the point of break in the defendant's pipeline.

Professor Quinn further testified that certain facts brought out in the examination of other witnesses tended to confirm his opinion as to the ground water slope. The first was the testimony of one of the plaintiff's chemists, who testified that when he went to the plaintiff's well to get samples for his chemical analysis he noticed water coming into the well from the north. This, Professor Quinn claimed, confirmed his view that the ground water slope at the well was toward the south or southeast in correspondence with the surficial slope, as indicated on some of plaintiff's exhibits.

The second fact was the testimony of one of defendant's witnesses that water from the sump was pumped to the area near tank No. 39 and allowed to leach away and later an abnormally high salt count had been found in the Martin well showing that the ground water slope from tank No. 39 was ultimately northeast. It had been testified that chemical analyses of water in the Martin well and the Mancib spring continued to show an abnormal salt count until after 1936, when the sump was allowed to become dry and was no longer used. Reports in evidence of all analyses of the water from the plaintiff's well showed that its salt count never varied from normal for that section; thus showing, Professor Quinn claimed, that the water pumped from the sump to a point near tank No. 39 could not leach away toward the northwest and reach plaintiff's well.

The third fact was the plaintiff's own exhibits F and G, showing the surface elevations indicating a surficial slope to the north away from defendant's tank No. 39 to a valley trending northeast from the Martin well to the Mancib spring.

412

Professor Brown took a view of the area but he made no test holes, although he testified that it was a proper method to be used in determining the ground water elevation and the ground water slope. On the whole his testimony is not corroborated to the same degree as is Professor Quinn's. In the circumstances the trial justice was not required to adopt Professor Brown's testimony that defendant's gasoline could invade plaintiff's premises over the ground water slope.

We deem it appropriate before concluding this opinion to observe that we have carefully read the transcript with particular attention to the testimony of the expert witnesses. In a great degree the trial appears to have reduced itself largely to a contest between experts in the fields of topographical engineering, chemistry, bacteriology, geology, agriculture and veterinary medicine. Much of this expert testimony was of necessity highly technical and could not be understood and correctly applied to the issues in the case without intelligent and close attention being given to each expert as he testified. It appears to us that the parties received from the trial justice the benefit of such attention to a marked degree.

Therefore we cannot say that his decision is clearly wrong. The plaintiff's exception to such decision is, accordingly, overruled, and the case is remitted to the superior court for entry of judgment for defendant.

*Albert deR. Baker, Albert A. Baker,* for plaintiff.

*Francis I. McCanna, Edward M. McEntee,* for defendant.